**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FAINESS B. LIPENGA, <br> Prince George's County, Maryland <br>         Plaintiff, <br><br> v. <br><br> JANE N. KAMBALAME, <br> 9-11 Duthie Road <br> Alexandra Park <br> P.O. Box 321 <br> Harare, Zimbabwe <br>         Defendant. | CIVIL ACTION NO. 8:14-cv-3980 <br><br> COMPLAINT FOR DAMAGES |

**COMPLAINT FOR DAMAGES**

**I. INTRODUCTION**

1. This action arises out of the illegal trafficking, forced labor, and tortious treatment of Fainess Bertha Lipenga ("Plaintiff" or "Ms. Lipenga") at the hands of Jane Ngineriwa Kambalame ("Defendant" or "Ms. Kambalame") while the latter was a diplomat at the Embassy of the Republic of Malawi in Washington, D.C. from May 2004 to January 2007.

2. In 2004, Ms. Kambalame persuaded Ms. Lipenga to accompany her to the United States by promising that Ms. Lipenga would be paid a fair wage, have suitable living and working conditions, and that Ms. Lipenga would have opportunities to learn English, continue her education, and earn more money. Ms. Kambalame induced Ms. Lipenga to sign an employment contract as part of her visa application to work in the United States.

3. From May 2004 to January 2007, Ms. Lipenga worked as a live-in housekeeper and child care provider in Ms. Kambalame's Silver Spring, Maryland home. Ms. Lipenga was forced to work from 5:30 a.m. to at least 11 p.m. seven days a week with almost no time off and was paid nothing at all for the first few months, and then between $100 and $180 USD per

month thereafter.  In addition, Ms. Kambalame was verbally and emotionally abusive to Ms. Lipenga, often refused to let her leave the house, and failed to provide adequate medical treatment when Ms. Lipenga became ill as a result of her working conditions and treatment.  At various times during her employment, Ms. Kambalame confiscated Ms. Lipenga's passport and kept it from Ms. Lipenga for extended periods of time.  Ms. Kambalame also refused to renew Ms. Lipenga's work visa and then threatened Ms. Lipenga with deportation and other legal processes if she were to leave Ms. Kambalame's employment.

4. In 2007, Ms. Lipenga was able to escape from Ms. Kambalame's home and seek medical and psychological treatment.  In 2009, Ms. Lipenga was granted a "T-visa" pursuant to 8 U.S.C. § 1101(a)(15)(T)(I), and was found to be "a victim of a severe form of trafficking in persons."  Ms. Lipenga obtained permanent residency in 2011.

5. Ms. Kambalame enjoyed diplomatic immunity in the United States until at least January 17, 2012, after which time she became Malawi's High Commissioner to Zimbabwe and Botswana.  Ms. Kambalame is currently believed to reside in Zimbabwe, but maintain a home in Malawi.

6. Ms. Kambalame's recruitment of Ms. Lipenga, including transporting her to the United States, as well as Ms. Kambalame's threats of legal process to force Ms. Lipenga to work for her, violate the federal Victims of Trafficking and Violence Protection Reauthorization Act ("TVPRA").  Ms. Kambalame's abusive treatment of Ms. Lipenga during her employment constitutes common law false imprisonment, intentional infliction of emotional distress, and intentional misrepresentation.  Ms. Kambalame's failure to pay Ms. Lipenga any wages during the beginning of her employment and subsequent payment to Ms. Lipenga of only $100 to $180

USD per month violates the federal Fair Labor Standards Act ("FLSA") and the Maryland Wage & Hour Law, and also constitutes common law breach of contract and unjust enrichment.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1595. This Court has supplemental jurisdiction over Plaintiff's causes of action arising under Maryland's Wage & Hour Law. It further has supplemental jurisdiction over Plaintiff's causes of action arising under Maryland's common law for false imprisonment, intentional infliction of emotional distress, intentional misrepresentation, breach of contract, and unjust enrichment. All of these state law actions are part of the same case or controversy as the federal TVPRA and FLSA causes of action.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## III. PARTIES

9. Plaintiff Fainess Bertha Lipenga is a citizen of Malawi and a lawful permanent resident of the United States, currently residing in Prince George's County, Maryland. From approximately May 24, 2004 to January 20, 2007, Ms. Lipenga resided at Ms. Kambalame's home at 2333 Massanutten Drive, Silver Spring, Maryland.

10. Defendant Jane Ngineriwa Kambalame is currently the High Commissioner to the Republic of Zimbabwe and the Republic of Botswana for the Republic of Malawi. From May 2004 until January 2012, Ms. Kambalame enjoyed diplomatic immunity while serving as First Secretary (Economic) at the Embassy of the Republic of Malawi in Washington, D.C. While working at the Embassy, Ms. Kambalame resided at 2333 Massanutten Drive, Silver Spring, Maryland.

## IV. FACTS

11. In 2002, Ms. Lipenga began working for Ms. Kambalame in Malawi as a domestic servant. At the time, Ms. Lipenga had an eighth grade education and did not speak English. Ms. Lipenga was primarily responsible for the care of Ms. Kambalame's daughter and shared other responsibilities, including laundry, with four other domestic workers. Ms. Lipenga's typical working hours in Malawi were from 9:00 a.m. to around 8:00 p.m. with Saturday evening and all of Sunday off.

**A.     Trafficking into the United States**

12. In 2004, Ms. Kambalame, a member of Malawi's foreign service, was assigned to work at the Malawian Embassy to the United States in Washington, D.C. Ms. Kambalame asked Ms. Lipenga to move to the United States and continue working for her family. Ms. Kambalame told Ms. Lipenga that her duties would be similar to those she performed in Malawi, but that she would also be expected to cook and clean. Ms. Kambalame further promised that Ms. Lipenga would have fair working conditions, be appropriately compensated and that Ms. Lipenga would have opportunities to learn English, continue her education, and earn additional money working for others.

13. Three weeks prior to leaving Malawi, Ms. Kambalame presented Ms. Lipenga with a series of documents written in English (which Ms. Lipenga did not speak, read or understand at the time) and demanded that she sign them quickly so that Ms. Kambalame could obtain Ms. Lipenga's visa. The documents included a Contract of Employment dated May 18, 2004 (the "Contract"), attached hereto as Exhibit A.

14. The Contract stated that Ms. Lipenga would be paid $980 USD per month, work 35 hours per week, and receive overtime pay for any additional time worked. Ex. A ¶¶ 1-2. The contract also stated that Ms. Kambalame would cover Ms. Lipenga's medical expenses, provide

her with paid sick leave, vacation time and two days off per week, and further provided that Ms. Lipenga would always retain control of her own passport. Ex. A ¶¶ 4-6. Ms. Kambalame submitted the Contract to the United States Embassy as part of the application for Ms. Lipenga's A-3 visa. Ms. Lipenga found the Contract at the Kambalame's home in the United States in 2006, after Ms. Lipenga overheard Ms. Kambalame telling an acquaintance that she had falsified documents in order to bring Ms. Lipenga into the country. Ms. Lipenga was able to recognize her name written on the document and took it, even though she did not yet understand it.

15. While at the airport in South Africa, en route to the United States, Ms. Kambalame informed Ms. Lipenga that she had lied to the U.S. Embassy by claiming she was related to Ms. Lipenga in order to obtain Ms. Lipenga's A-3 visa. Ms. Kambalame then told Ms. Lipenga that she must lie to the immigration officials and that if she did not claim a family link to Ms. Kambalame, she would be left in South Africa. Ms. Lipenga, fearful of remaining in South Africa alone and with no way to return to Malawi, complied with Ms. Kambalame's demands.

16. Immediately after they arrived in the United States, Ms. Kambalame confiscated Ms. Lipenga's passport and kept it until early 2005. After recovering her passport in 2005, fearful that she would suffer repercussions if her visa expired while she was still in the country, Ms. Lipenga asked Ms. Kambalame to renew her A-3 visa. Ms. Kambalame refused to do so and made repeated threats to Ms. Lipenga that if she ever left Ms. Kambalame's employment, due to Ms. Kambalame's position of power and diplomatic status, the authorities would come find her no matter where she went. In June 2006, Ms. Kambalame once again confiscated Ms. Lipenga's passport, threatening Ms. Lipenga with deportation unless she surrendered it. Approximately three months later, Ms. Lipenga searched for and located her passport in Ms.

Kambalame house, removed it briefly to make a copy, and replaced it.  Ms. Lipenga secretly took her passport back shortly before her escape.

17. In 2005, Ms. Kambalame also began to threaten to call the police or other authorities if Ms. Lipenga ever left her employment, ran away, or told anyone about her working conditions in the Kambalame home.  Around this time, Ms. Lipenga began housecleaning for a colleague of Ms. Kambalame, in addition to carrying out her normal work in Ms. Kambalame's home.  Ms. Lipenga was only able to perform this additional work for a short period because Ms. Kambalame began to berate Ms. Lipenga each time she left the house to work for the other family, calling Ms Lipenga ungrateful and ridiculing Ms. Lipenga for wanting more money beyond the meager salary Ms. Kambalame was providing.  Due to Ms. Kambalame's daily aspersions and repeated threats, Ms. Lipenga turned down an offer of full-time employment from the other family, stopped working at their house, and realized that she could no longer work outside of the Kambalame home without suffering severe repercussions.

18. In addition to consistently threatening to turn Ms. Lipenga in to the police and/or immigration authorities if she discussed her working conditions with anyone outside the household, Ms. Kambalame repeatedly told Ms. Lipenga that, due to Ms. Kambalame's diplomatic status, she could never get into trouble for Ms. Lipenga's working conditions, abuse, low wages, or the restrictions imposed upon her freedom.

**B.    Ms. Lipenga's Working Hours and Salary**

19. Ms. Lipenga worked from 5:30 a.m. to 11:00 p.m. most days.  Ms. Lipenga was occasionally permitted time off to attend church on Sunday mornings and to visit the doctor.  In addition to her regular daily duties, Ms. Kambalame required Ms. Lipenga to work additional hours whenever the Kambalame family entertained, and even required her to work at events Ms. Kambalame attended that were hosted by other Malawian families.  At times, under Ms.

Kambalame's direction, Ms. Lipenga also worked for Ms. Kambalame's friends and family members who paid Ms. Lipenga for her services to them. These additional work requirements often ran into the early morning, and on some occasions Ms. Lipenga was permitted no sleep at all.

20. Ms. Lipenga's salary during this period varied. For the first few months of her employment in the United States, Ms. Lipenga was not compensated at all. After that, her salary from Ms. Kambalame varied between $100 USD per month to $180 USD per month. Based on Ms. Lipenga's schedule, her salary from Ms. Kambalame was less than 50 cents per hour. The Federal minimum wage from 2004-2007 was $5.15 per hour; the Maryland minimum wage was $5.15 per hour from 2004 through February 15, 2006 and increased to $6.15 per hour on February 16, 2006.

C. **Ms. Lipenga's Working Conditions**

21. At Ms. Kambalame's home in Silver Spring, Ms. Lipenga was subjected to grievous working conditions and to daily emotional and psychological abuse from Ms. Kambalame and other members of her household.

22. Ms. Lipenga was required to cook all meals for the family, serve tea whenever the family desired, shovel snow, clean the entire house every day, wash, iron, and fold laundry, in addition to caring for Ms. Kambalame's daughter. Every evening, Ms. Kambalame returned home and inspected all of Ms. Lipenga's work, including running her finger along the top of doorframes and other remote surfaces to check for dust, and often required the re-vacuuming of carpets Ms. Lipenga had already cleaned that day, as a means to belittle and humiliate her. Ms. Kambalame routinely verbally attacked Ms. Lipenga for any work that was not done to Ms. Kambalame's apparent satisfaction, including telling Ms. Lipenga that she was unable to do anything right and not worth all that Ms. Kambalame was providing for her. These verbal

attacks repeatedly brought Ms. Lipenga to tears and ended with Ms. Lipenga being isolated in the basement of Ms. Kambalame's townhouse. Further, Ms. Kambalame did not allow Ms. Lipenga to use the family's shampoo or soap, or to use the same pillows and blankets the family used, requiring Ms. Lipenga to instead buy her own supplies and keep them separate from the family's, so as to avoid Ms. Lipenga's items "contaminating" the family's belongings.

23. Before Ms. Lipenga was allowed to leave the house by herself, she was required to gain permission from Ms. Kambalame and disclose where she was going, with whom she was meeting, and promise to return by a specific time. Further, Ms. Kambalame called the house throughout the day on several occasions to ensure that Ms. Lipenga stayed inside and did not leave the house. In late 2006 Ms. Kambalame changed the locks on the house, with the new locks requiring an entry code, and refused to give Ms. Lipenga the code in order to be able to leave and enter the property when she wished. In addition to having to gain Ms. Kambalame's permission to leave the house, after the locks were changed Ms. Lipenga was unable to leave unless she was accompanied or someone was home and able to grant her re-entry.

24. Initially Ms. Lipenga was allowed to call her relatives in Malawi. However, after Ms. Kambalame secretly listened in on a phone call wherein Ms. Lipenga told her family of the poor treatment she suffered at the hands of Ms. Kambalame and the appalling conditions of employment and daily life in Ms. Kambalame's home, Ms. Kambalame berated Ms. Lipenga and then began disconnecting the phone every time Ms. Kambalame left the house. As such, Ms. Lipenga was unable to contact her family when she could speak freely. Even when Ms. Kambalame was home and the phone was connected, Ms. Lipenga was too afraid to call her family because she knew Ms. Kambalame would listen in on the call and punish her for anything negative that was said about Ms. Kambalame.

25. Ms. Kambalame vehemently scolded Ms. Lipenga on a regular basis, including accusing her of stealing from the family and of flirting and sleeping with Ms. Kambalame's live-in boyfriend and later husband, among other false accusations. Often Ms. Kambalame repeated such accusations in the presence of other members of the Malawian community, further humiliating and publicly disgracing Ms. Lipenga. These incidents and the ensuing rumors mortified Ms. Lipenga and effectively severed ties between her and other members of the Malawian community.

26. In the latter part of 2006, Ms. Kambalame began tormenting Ms. Lipenga with a video camera. She filmed her while working, trying to get her to make mistakes on camera to demonstrate how incompetent and useless she was, and even purposefully yelled at Ms. Lipenga to make her cry so she could film her crying and then ridicule her for it. This torment occurred three to four times per week until Ms. Lipenga ultimately left the Kambalame home in January 2007.

27. As a result of her excessive work responsibilities and the emotional distress caused by Ms. Kambalame's daily debasement and abuse of her, Ms. Lipenga became very ill. Even though Ms. Lipenga developed a cough and a rash over her whole body, Ms. Kambalame refused to allow Ms. Lipenga to obtain medical treatment for several weeks, and forced her to continue working from 5:30 a.m. to at least 11 p.m., claiming that it was Ms. Lipenga's own fault for becoming ill. In May 2005 Ms. Kambalame finally allowed Ms. Lipenga to see a doctor-friend of the family; he merely prescribed her prednisone and a skin cream, without taking any further steps to investigate her medical condition or deteriorating health, even after approximately five more appointments over a period of a year and a half. Except for her first visit to the doctor, Ms. Lipenga was required to pay for all medical visits and prescriptions.

28. Due to Ms. Kambalame's severe and persistent emotional and mental torment of her, Ms. Lipenga began to experience stomach cramps and was eventually unable to retain any food. At one point, Ms. Lipenga confided in the doctor that she was depressed as a result of Ms. Kambalame's constant threats and abuse. Ms. Kambalame, after learning of this disclosure, reprimanded Ms. Lipenga with severe criticism and further threats. After this incident Ms. Lipenga became so dejected and despondent that she was unable to eat anything for at least a week.

29. Ms. Kambalame eventually moved Ms. Lipenga's living quarters from a shared room with Ms. Kambalame's daughter to the basement of the Kambalame home in the end of 2006. In the basement, Ms. Lipenga was forced to sleep on a wooden floor with only one blanket and no pillow and was refused an additional blanket when she requested one from Ms. Kambalame. As a result of Ms. Kambalame's actions, Ms. Lipenga's health deteriorated further. Ms. Lipenga continued to lose weight and became so ill that Ms. Kambalame told her she looked like she was about to fall over. Despite Ms. Lipenga's clearly worsening state of health, Ms. Kambalame refused to seek medical care for Ms. Lipenga and continued to force her to work her normal hours. Ms. Lipenga's health eventually declined to the point that she feared she would die if she did not escape.

D. **Ms. Lipenga's Escape**

30. Ms. Lipenga, sick and emaciated, escaped from the Kambalame household by sneaking out before Ms. Kambalame was awake early on the morning of January 20, 2007. She fled to the house of a fellow Malawian domestic worker who spoke English and helped her find employment with a family in Maryland. Ms. Lipenga was only able to work for two months before she had to be hospitalized. During her hospitalization, Ms. Lipenga was diagnosed with tuberculosis, HIV, and depression, all of which had gone undiagnosed and untreated during her

time working for Ms. Kambalame. Ms. Lipenga spent substantial time in the hospital on this occasion and subsequently required further hospitalizations for depression and anxiety triggered by Ms. Kambalame's behavior.

31. After discovering Ms. Lipenga's whereabouts, Ms. Kambalame showed up at the hospital unexpectedly. At that time, Ms. Kambalame told Ms. Lipenga to return to the Kambalame household when she was discharged. However, two members of the Malawian community, aware of the circumstances surrounding Ms. Lipenga's employment, warned Ms. Lipenga that Ms. Kambalame was informing people she planned to deport Ms. Lipenga as soon as she returned from the hospital and that Ms. Kambalame had asked other members of the Malawian community to find out where Ms. Lipenga lived. Ms. Kambalame further telephoned Ms. Lipenga during a subsequent hospitalization and berated her for not informing Ms. Kambalame of her whereabouts, causing Ms. Lipenga further anxiety and fear.

32. In 2009, after her social worker put her in touch with a *pro bono* human rights legal clinic, Ms. Lipenga applied for and was granted a "T-visa." As part of her application, Ms. Lipenga submitted affidavits and other evidence detailing her trafficking into the United States and treatment in the Kambalame household. By granting her T-visa, the Department of Homeland Security, pursuant to 8 U.S.C. § 1101(a)(15)(T), made an administrative finding that Ms. Lipenga is "a victim of a severe form of trafficking in persons." Ms. Lipenga subsequently obtained permanent residency in the United States in 2011.

33. Ms. Kambalame remained in the United States as a member of the Malawian diplomatic mission until at least January 2012. Diplomatic List, United States Department of State, January 17, 2012, attached hereto as Exhibit B. On information and belief, Ms. Kambalame currently resides in Zimbabwe, but maintains a home in Malawi.

## COUNT I
**Violations of the Victims of Trafficking and Violence Protection Reauthorization Act, 18 U.S.C. §§ 1589 & 1590**

34. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 33 of this Complaint.

35. During the course of Ms. Lipenga's employment, Ms. Kambalame repeatedly threatened abuse of the law and legal process in order to retain Ms. Lipenga's labor and services, in violation of 18 U.S.C. § 1589.

36. Ms. Kambalame knowingly recruited and transported Ms. Lipenga from Malawi into the United States for forced labor, in violation of 18 U.S.C. § 1590.

37. Ms. Kambalame's acts were deliberate, malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT II
**Willful Violations of the Fair Labor Standards Act, 29 U.S.C. § 206(f)**

38. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 37 of this Complaint.

39. At all times relevant to this Complaint, Ms. Kambalame paid Ms. Lipenga less than the federal minimum wage, in violation of 29 U.S.C. § 206(f).

40. Ms. Kambalame was aware of the federal minimum wage when, as part of Ms. Lipenga's visa application, Ms. Kambalame submitted the Contract to the United States Embassy stating that Ms. Lipenga would be paid $980 per month for 35 hours of work per week.

41. For these reasons, Ms. Kambalame's failure to pay Ms. Lipenga at least the federal minimum wage was in knowing or reckless disregard of the Federal Labor Standards Act's requirements.

## COUNT III
### Violations of the Maryland Wage & Hour Law,
### Md. Code Ann., Labor & Emp. §§ 3-413, 4-415

42. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 41 of this Complaint.

43. At all times relevant to this Complaint, Ms. Kambalame paid Ms. Lipenga less than the Maryland minimum wage, in violation of Md. Code Ann., Labor & Emp. § 3-413.

44. At all times relevant to this Complaint, Ms. Lipenga was not compensated at 1.5 times the minimum wage for overtime work, in violation of Md. Code Ann., Labor & Emp. § 3-415.

## COUNT IV
### Common Law False Imprisonment

45. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 44 of this Complaint.

46. Ms. Kambalame falsely imprisoned Ms. Lipenga when she refused to provide Ms. Lipenga with the security code to enter the house and refused to let Ms. Lipenga leave the house without permission.

47. These actions unlawfully deprived Ms. Lipenga of her liberty, against Ms. Lipenga's will.

## COUNT V
### Common Law Intentional Infliction of Emotional Distress

48. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 47 of this Complaint.

49. Ms. Kambalame intentionally and recklessly caused severe emotional distress to Ms. Lipenga by her extreme and outrageous conduct, including repeatedly threatening to call the

police and immigration authorities, falsely accusing Ms. Lipenga of wrongful conduct in front of community members, and purposefully tormenting Ms. Lipenga in order to make her cry and then filming Ms. Lipenga's resulting emotional collapse.

50. As a result of these actions, Ms. Lipenga suffered severe emotional distress, manifested physically by her inability to eat and medical diagnosis of anxiety and depression.

**COUNT VI**
**Common Law Fraud (Intentional Misrepresentation)**

51. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 50 of this Complaint.

52. Ms. Kambalame knowingly made false representations to Ms. Lipenga regarding her future conditions of employment while in the United States, in particular that: (1) Ms. Lipenga's conditions of employment would be fair and she would have increased opportunities for education; (2) her typical working hours would be similar to those in Malawi (from 9 a.m. to 8 p.m. with Saturday afternoon and all of Sunday off);  and (3) she would be appropriately compensated.  Upon arrival in the United States, Ms. Lipenga was forced to work from 5:30 a.m. to at least 11:00 p.m. and was only occasionally allowed to attend church on Sundays or visit the doctor after obtaining permission from Ms. Kambalame.  In addition to her regular duties, Ms. Lipenga was required to work during the social events Ms. Kambalame frequently hosted.  Ms. Kambalame paid Ms. Lipenga  nothing for the first few months of her employment and thereafter paid only between $ 100 USD to $180 USD per month and emotionally and mentally abused and tormented Ms. Lipenga on a regular basis.

53. Ms. Kambalame made these false representations to Ms. Lipenga with the purpose of inducing Ms. Lipenga's to agree to come to the United States and work for Ms. Kambalame's household.

54. Ms. Lipenga reasonably relied on Ms. Kambalame's representations and would not have agreed to work for Ms. Kambalame in the United States had she known what her true working and living conditions and compensation would be.

55. Ms. Lipenga suffered damage as a direct result of her reliance on Ms. Kambalame's statements.

## COUNT VII
### Breach of Contract

56. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 55 of this Complaint.

57. Ms. Kambalame breached the written contract she entered into with Ms. Lipenga and submitted to the United States Embassy in order to obtain Ms. Lipenga's A-3 visa.

58. This breach included Ms. Kambalame's failure to pay the promised salary, and failure to provide the benefits and conditions of employment specified in the Contract.

## COUNT VIII
### Unjust Enrichment

59. Ms. Lipenga re-alleges and incorporates paragraphs 1 through 58 of this complaint.

60. Ms. Lipenga's work in the Kambalame household conferred a benefit upon Ms. Kambalame.

61. Ms. Kambalame knew of the benefit she received from Ms. Lipenga's work, and appreciated that benefit.

62. Ms. Kambalame has not yet paid fair value for Ms. Lipenga's services.

63. It would be inequitable to allow Ms. Kambalame to retain the benefit of Ms. Lipenga's services without paying their fair value.

**PRAYER FOR RELIEF**

64.     Wherefore, Ms. Lipenga respectfully prays for entry of a judgment against Defendant, Ms. Kambalame, for: actual damages in an amount to be proven at trial; punitive damages; reasonable attorneys' fees; and such other and further relief as the Court deems appropriate.

**JURY DEMAND**

Ms. Lipenga respectfully requests a trial by jury on all issues so triable as of right pursuant to Rule 38(b).


Dated:     December 19, 2014                Respectfully Submitted,

                                            JONES DAY

                                            _/s/ Joseph W. Clark_____
                                            Joseph W. Clark
                                            U.S. District Court of Md. Bar No. 28992
                                            jwclark@jonesday.com

                                            Melissa S. Gorsline (*Pro Hac Vice* to be filed)
                                            D.C. Bar No. 466402
                                            msgorsline@jonesday.com

                                            Charles T. Kotuby, Jr. (*Pro Hac Vice* to be filed)
                                            D.C. Bar No. 492416
                                            ctkotubyjr@jonesday.com

                                            51 Louisiana Avenue, N.W.
                                            Washington, D.C.  20001.2113
                                            Telephone:   +1.202.879.3939
                                            Facsimile:   +1.202.626.1700


                                            *Attorneys for Plaintiff, Fainess B. Lipenga*