FILED
U.S. DISTRICT COURT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

2016 NOV -9 ₱ 4: 58

CLERK'S OFFICE
AT GREENBELT

BY_____

| | | |
|---|---|---|
| **FAINESS B. LIPENGA,** | * | |
| **Plaintiff,** | * | |
| **v.** | | **Case No.: GJH-14-3980** |
| | * | |
| **JANE N. KAMBALAME,** | | |
| | * | |
| **Defendant.** | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This case arises out of the alleged "illegal trafficking, forced labor, and tortious treatment" of Plaintiff Fainess Bertha Lipenga ("Plaintiff" or "Ms. Lipenga") by Defendant Jane Ngineriwa Kambalame ("Defendant" or "Ms. Kambalame"). ECF No. 1 ¶ 1.[1] Following Ms. Kambalame's failure to plead or otherwise defend in this action, the Clerk entered an Order of Default against her. ECF No. 21. Presently pending before the Court is Plaintiff's Motion for Default Judgment, ECF No. 23. No hearing is necessary. Local Rule 105.6 (D. Md.). For the following reasons, Plaintiff's Motion for Default Judgment is granted, in part, and denied, in part, and damages are awarded in the sum of $1,101,345.20, plus reasonable attorney's fees.[2]

---

[1] As this Opinion follows an Entry of Default against Defendant, all facts herein are taken from Plaintiff's Complaint, ECF No. 1.

[2] In Plaintiff's Motion for Default Judgment, ECF No. 23, counsel did not provide an amount requested for attorney's fees. Therefore, the Court anticipates Plaintiff will file a separate motion with proper documentation of hours expended and reasonable hourly rate(s), pursuant to Appendix B of the U.S. District Court for the District of Maryland Local Rules.

## I.    BACKGROUND

Fainess Lipenga is a citizen of Malawi and lawful permanent resident of the United States, now residing in Prince George's County, Maryland. ECF No. 1 ¶ 9. Jane Kambalame is currently the High Commissioner to the Republic of Zimbabwe and the Republic of Botswana for the Republic of Malawi. *Id.* ¶ 10. Ms. Kambalame served as a diplomat at the Embassy of the Republic of Malawi in Washington, D.C. from May 2004 to January 2012. *Id.*

Ms. Lipenga began working for Ms. Kambalame in 2002 as a domestic servant at Ms. Kambalame's home in Malawi. *Id.* ¶ 11. At that time, Ms. Lipenga had an eighth grade education and did not speak English. *Id.* Ms. Lipenga's duties in the Kambalame home included caring for Ms. Kambalame's young daughter and doing the family's laundry. *Id.* Ms. Lipenga typically worked from 9:00 am to 8:00 pm, with Saturday evenings and Sundays off. *Id.* In 2004, Ms. Kambalame was assigned to work at the Embassy of Malawi in Washington, D.C. *Id.* ¶ 12. Ms. Kambalame asked Ms. Lipenga to move to the United States with her and continue working for the family. *Id.* Ms. Kambalame assured Ms. Lipenga that her duties in the U.S. would be similar to those she performed in Malawi, and promised that Ms. Lipenga would enjoy fair working conditions, appropriate compensation, and the opportunity to learn English and further her education. *Id.*

Three weeks before leaving Malawi, Ms. Kambalame presented Ms. Lipenga with several documents written in English. *Id.* ¶ 13. Ms. Lipenga could not read or understand the documents at the time, but Ms. Kambalame demanded that she sign them quickly so that she could obtain Ms. Lipenga's visa. *Id.* One of these documents was a Contract of Employment, dated May 18, 2004 ("the Contract"). *Id.* ¶ 14 ; ECF No. 1-1. The Contract stated that Ms. Lipenga would be paid $980 per month, work 35 hours per week, and receive overtime pay "for each hour worked

2

beyond the weekly agreed hours." *Id.* Ms. Lipenga was to be entitled two days off per week and paid holidays for two weeks a year. *Id.* The contract also stated that Ms. Kambalame, as Ms. Lipenga's employer, would cover Ms. Lipenga's medical expenses and provide her with paid sick leave. *Id.* The contract guaranteed that Ms. Lipenga would always retain control of her own passport and immigration documents. *Id.* Both Ms. Kambalame and Ms. Lipenga signed the Contract. *Id.* ¶ 13–14; ECF No. 1-1. Ms. Kambalame submitted the Contract to the United States Embassy as part of the application for Ms. Lipenga's A-3 visa.[3] ECF No. 1 ¶ 14.

While at the airport in South Africa en route to the United States, Ms. Kambalame informed Ms. Lipenga that she had lied to the U.S. Embassy, claiming that she was related to Ms. Lipenga in order to obtain her visa. *Id.* ¶ 15. Ms. Kambalame told Ms. Lipenga if she did not confirm with immigration officials that she was related to Ms. Kambalame, Ms. Kambalame would abandon her in South Africa. *Id.* In fear, Ms. Lipenga acquiesced to Ms. Kambalame's demands. When they arrived in the United States, Ms. Kambalame took Ms. Lipenga's passport from her. *Id.* ¶ 16. Ms. Kambalame told Ms. Lipenga that if she ever left her employment, Ms. Kambalame would have her deported. When Ms. Lipenga later asked Ms. Kambalame to help renew her visa, Ms. Kambalame refused. Ms. Kambalame informed Ms. Lipenga that because of her diplomatic status, she could never get in trouble with the authorities. *Id.* ¶ 18.

On most days, Ms. Lipenga worked at the home from 5:30 a.m. to 11:00 p.m. ECF No. 1 ¶ 19. Occasionally, she was permitted to attend church on Sunday mornings. *Id.* Ms. Kambalame often required Ms. Lipenga to work additional hours late into the night when the family was entertaining guests. *Id.* Sometimes, Ms. Lipenga had to work on no sleep at all. *Id.* Ms. Lipenga's salary varied; for the first few months, Ms. Kambalame did not pay her at all. *Id.* ¶ 20.

---

[3] While an A-1 visa is provided to an "ambassador, public minister, career diplomat or consular office, or immediate family [of an A-1 visa holder]," an A-3 visa is provided to an "attendant, servant, or personal employee of A1 or A2, or immediate family [of an A-3 visa holder]." 22 C.F.R. § 41.12.

After that, Ms. Lipenga received between $100 and $180 per month. *Id.* Based on Ms. Lipenga's schedule, that equaled less than 50 cents per hour. *Id.* The federal minimum wage during this time was $5.15 per hour. 29 U.S.C. 206(a)(1) (2006). The Maryland minimum wage was $5.15 per hour from 2004 through February 15, 2006, and increased to $6.15 per hour on February 16, 2006. Md. Code Ann., Lab. & Empl. § 3-413 (West 2006).

Ms. Lipenga alleges that Ms. Kambalame subjected her to grievous working conditions and psychological abuse during her nearly three-year period of employment. ECF No. 1 ¶ 21. In addition to caring for Ms. Kambalame's daughter, Ms. Lipenga was required to cook all meals for the family, clean the entire house every day, serve tea upon request, wash, iron, and fold laundry, and shovel snow. *Id.* ¶ 22. Ms. Kambalame frequently berated and belittled Ms. Lipenga while she worked. *Id.* Ms. Kambalame would tell Ms. Lipenga that she could not do anything right and was not worth all that Ms. Kambalame provided for her. *Id.* In late 2006, Ms. Kambalame began filming Ms. Lipenga, causing Ms. Lipenga to cry on camera, and then using the footage to further torment Ms. Lipenga. *Id.* ¶ 26. Ms. Kambalame would not allow Ms. Lipenga to use the family's shampoo or soap, as to avoid "contaminating" the family's belongings. *Id.* For the latter part of her employment, Ms. Kambalame required Ms. Lipenga to sleep in the basement on a wooden floor with only one pillow and a blanket. *Id.* ¶ 19.

Ms. Lipenga had to ask for permission to leave the house and tell Ms. Kambalame where she was going. *Id.* ¶ 23. In late 2006, Ms. Kambalame installed a lock on the house with an entry code, and refused to give Ms. Lipenga the code, effectively confining Ms. Lipenga to the house unless someone was home to let her back in. *Id.* Ms. Kambalame eavesdropped on Ms. Lipenga's phone calls, and disconnected the phone when she left the house, so Ms. Lipenga could not contact anyone. *Id.* ¶ 24. Ms. Kambalame humiliated Ms. Lipenga in the presence of

other people, by falsely accusing her of stealing from the family and sleeping with Ms.
Kambalame's live-in boyfriend. *Id.* ¶ 25. These rumors embarrassed Ms. Lipenga and alienated
her from other members of the local Malawian community. *Id.*

As a result of these working conditions and emotional abuse, Ms. Lipenga became very
ill and depressed. ECF No. 1 ¶ 27. She developed a cough and a rash over her entire body. *Id.*
Ms. Kambalame refused to let Ms. Lipenga see a doctor for several weeks and forced her to
continue working the same hours. *Id.* Ms. Kambalame eventually allowed Ms. Lipenga to see a
doctor-friend of the family, who prescribed her only a skin cream for her rash. *Id.* Ms. Lipenga's
health continued to deteriorate to the point that she feared she would die if she did not escape
Ms. Kambalame's control. *Id.* ¶ 29.

Ms. Lipenga escaped the Kambalame household early in the morning on January 20,
2007 while Ms. Kambalame was asleep. ECF No. 1 ¶ 30. She fled to the home of a fellow
Malawian domestic worker who spoke English and helped her find work with another family in
Maryland. *Id.* Ms. Lipenga was only able to work for two months before she became gravely ill.
*Id.* Ms. Lipenga was hospitalized and subsequently diagnosed with tuberculosis, HIV, and
depression, all of which had gone untreated for years. *Id.* Ms. Kambalame arrived at the hospital
unexpectedly, castigating Ms. Lipenga for absconding, and demanding that she return to the '
house when she was discharged. *Id.* ¶ 30–31. Other members of the Malawian community
informed Ms. Lipenga that Ms. Kambalame was planning on having Ms. Lipenga deported,
causing her to suffer additional anxiety and fear. *Id.* ¶ 31.

In 2009, a social worker assigned to Ms. Lipenga put her in touch with a *pro bono* human
rights legal clinic. ECF No. 1 ¶ 32. With the clinic's help, Ms. Lipenga was able to obtain a T

visa.[4] In granting her a T visa, the Department of Homeland Security reviewed Ms. Lipenga's case and made an administrative finding that she was "a victim of a severe form of trafficking in person." *Id.* Ms. Lipenga obtained permanent residency in the United States in 2011. *Id.* Ms. Kambalame remained in the United States until January 2012. *Id.* ¶ 33. On Plaintiff's information and belief, Ms. Kambalame now resides in Zimbabwe, but maintains a home in Malawi. *Id.*

Plaintiff filed the instant complaint on December 19, 2014. ECF No. 1; ECF No. 17 at 1. Plaintiff attempted, but was unable to locate and serve Defendant at her personal address in Malawi. *See* ECF No. 17 at 2. Plaintiff also sent a request for service to the Malawian Central Authority, in accordance with Fed. R. Civ. P. 4(f) and Articles 3 and 5 of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, *opened for signature* Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638. *Id.* Despite email correspondence with a representative of the Malawian High Court in May 2015, confirming that service was effected upon Ms. Kambalame, Plaintiff never received an official certificate of service. *Id.* at 3. On December 28, 2015, this Court declined to enter default against Defendant, but ordered Plaintiff to serve Ms. Kambalame with alternative process by sending copies of the summons, Complaint, and the Court's Memorandum Opinion and Order to Ms. Kambalame's email address and Facebook account. ECF No. 18. Plaintiff complied with the Court's Order on December 30, 2015. ECF No. 19. Ms. Lipenga again moved for an entry of default on January 28, 2016, which the Clerk entered against Ms. Kambalame on March 4, 2016. ECF No. 21. Plaintiff filed the presently pending Motion for Default Judgment on April 25, 2016. ECF No. 23. Defendant has not responded or participated in this case.

---

[4] A T visa is provided to "victim[s] of a severe form of trafficking in persons." 22 C.F.R. § 41.12.

6

## II.     STANDARD OF REVIEW

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "A defendant's default does not automatically entitle the plaintiff to entry of a default judgment; rather, that decision is left to the discretion of the court." *Educ. Credit Mgmt. Corp. v. Optimum Welding*, 285 F.R.D. 371, 373 (D. Md. 2012). The Fourth Circuit has a "strong policy" that "cases be decided on their merits." *Dow v. Jones,* 232 F. Supp. 2d 491, 494 (D. Md. 2002) (citing *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 453 (4th Cir. 1993)). However, default judgment may be appropriate where a party is unresponsive. *Optimum Welding*, 285 F.R.D. at 373.

In deciding whether to render default judgment, "the well-pled allegations in a complaint as to liability are taken as true, but the allegations as to damages are not." *Id.* (citing *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)). Thus, the court first determines whether the unchallenged factual allegations constitute a legitimate cause of action. *Agora Fin., LLC v. Samler*, 725 F. Supp. 2d 491, 494 (D. Md. 2010). If liability is established, the court then makes an independent determination of damages. *Id.* The court may hold a hearing on the amount of damages, or instead may rely on "detailed affidavits or documentary evidence." *Optimum Welding*, 285 F.R.D. at 374. The relief granted in a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *Id.*

### III.   ANALYSIS

#### A. Liability

##### i.   Trafficking Victims Protection Act

The Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. §§ 1581 *et seq.* prohibits peonage, slavery, and trafficking in persons. Victims of human trafficking have a civil cause of action against the perpetrator in district courts of the United States, and may recover damages and reasonable attorney's fees. § 1585. A defendant is liable under § 1589(a) of the TVPRA when she "knowingly provides or obtains the labor or services of a person" by any of the following means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). A defendant is also liable under § 1590 if she "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services." 18 U.S.C. § 1590(a); *see also Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 454 (E.D. Va. 2015) (noting that liability for trafficking is separate from liability for involuntary servitude) (citing *Shukla v. Sharma*, No. 07-cv-2972, 2012 WL 481796, at *14 (E.D.N.Y. Feb. 14, 2012)). Claims under § 1590 "generally require[] some conduct that occurs abroad." *Lagasan*, 92 F. Supp. 3d at 454.

Here, Plaintiff's Complaint provides ample facts to show that Ms. Kambalame is liable under both § 1589(a) and § 1590(a). Specifically, Plaintiff has alleged facts that demonstrate Ms. Kambalame obtained Ms. Lipenga's labor by abuse or threatened abuse of law or legal process. 18 U.S.C. § 1589(a)(3). Ms. Kambalame allegedly confiscated Ms. Lipenga's passport and threatened to call the police and have her deported. ECF No. 1 ¶ 16; *see Elat v. Ngoubene*, 993 F. Supp. 2d 497, 523 (D. Md. 2014) (discussing threat of deportation as abuse of legal process); *Kiwanuka v. Bakiliana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012) (describing threats of deportation as condition of servitude and abuse of legal process). Plaintiff has also alleged facts that Ms. Kambalame recruited her services in Malawi and induced her to come to the United States under the false promises of fair working conditions and appropriate compensation. ECF No. 1 ¶ 12. Plaintiff alleges that Ms. Kambalame lied to the U.S. embassy, claiming a fraudulent family tie, in order to obtain Ms. Lipenga's visa. *Id.* ¶ 15; *see Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445 (E.D. Va. 2015) (finding defendants liable under § 1590 where defendants fraudulently acquired visa to bring plaintiff to United States for purpose of forced labor). Hence, Plaintiff has pled sufficient facts to establish Defendant's liability under the TVPRA.

### ii. Federal Minimum Wage Under FLSA

Under the Fair Labor Standards Act (FLSA), an individual employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect. 29 U.S.C. § 206(f)(1). Between May 2004 and January 2007, the federal minimum wage was $5.15 per hour. To establish a defendant's violation of the FLSA for non-payment of minimum wage under 29 U.S.C. § 206, a plaintiff must show that: "(1) plaintiff was employed by the defendant; (2) plaintiff was engaged in commerce or in the production of goods for commerce; (3) plaintiff was not compensated for all hours worked during each work week at a rate equal to or greater than

9

the applicable minimum wage; and (4) none of the exemptions in 29 U.S.C. § 213 apply to plaintiff's position." *Lagasan*, 92 F. Supp. 3d at 455; *Dutan v. Sheet Metal Remodeling, LLC*, 48 F. Supp. 3d 860, 868 (E.D. Va. 2014).[5]

Plaintiff has alleged sufficient facts supporting these elements. Here, Defendant was an employer under 29 U.S.C. § 203(d) and Plaintiff was an employee under 29 U.S.C. § 203(e), because Ms. Kambalame hired Ms. Lipenga "to work in [her] private home on the promise of an exchange of payment in return for her services." *See Lagasan*, 92 F. Supp. 3d at 455. The FLSA specifically recognizes domestic service work, such as that performed by Ms. Lipenga. 29 U.S.C. § 206(f). During her employment with Ms. Kambalame, Ms. Lipenga worked an average of 17 hours on weekdays, 15.5 hours on Saturdays, and 8 hours on Sundays — thus working 108.5 hours per week. ECF No. 23-1 at 10. Ms. Kambalame received between $100 and $180 per month, far below the minimum wage she was entitled. ECF No.1 ¶ 20. No evidence presented suggests Ms. Lipenga fell under any exemption to the minimum wage. Plaintiff has also alleged sufficient facts that Ms. Kambalame's conduct was willful. Plaintiff alleged that Ms. Kambalame prepared and signed a contract that promised to pay Ms. Lipenga a monthly salary of $980.00 and $6.71 for each hour worked per week beyond 35 hours. ECF No. 1 ¶ 14; ECF No. 1-1. Ms. Kambalame signed and submitted this contract to obtain Ms. Lipenga's visa. ECF No. 1 ¶ 13–15. Despite their agreement, Ms. Kambalame never paid Ms. Lipenga the contractual wage or even the required minimum wage, and in fact paid her "less than 50 cents per hour." ECF No. 1 ¶ 20. Thus, Plaintiff has stated a claim under the FLSA.[6]

---

[5] While Ms. Lipenga is entitled to the minimum wage under the FLSA, she is not entitled to overtime compensation under the FLSA because she was "an employee employed in domestic service in a household and who resides in such household." 29 U.S.C. § 213(b)(21).

[6] The Court notes that the statute of limitations, which would typically bar these claims, is an affirmative defense, requiring the defendant to affirmatively plead its existence. The Fourth Circuit has held that the statute of limitations is not jurisdictional in nature, and thus a defendant waives the defense by failing to raise it. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648 (4th Cir. 2006) (holding that District Court erred in raising statute of limitations defense *sua*

### iii.   Maryland's Wage and Hour Law

The Maryland Wage and Hour Law (MWHL) also imposes an obligation on employers to pay the minimum wage and overtime compensation to covered employees. Md. Code Ann., Lab & Empl. §§ 3-413, 3-415. Ms. Kambalame is an employer within the meaning of the MWHL, § 3-401, and Ms. Lipenga is an employee, falling within no exemption under § 3-403. Although live-in domestic servants are exempt from overtime under the FLSA, 29 U.S.C. § 213(b)(21), no such exemption exists under the Maryland Wage and Hour Law. *See Lagrimas v. Gossel*, Civ. A. No. HAR 92-2262, 1993 WL 18951, at *2 (D. Md. Jan. 25, 1993) (granting overtime to live-in domestic servant and babysitter under Maryland Wage and Hour Law).

Plaintiff has alleged sufficient facts to establish a claim for failure to pay the minimum wage under the MWHL. Under Md. Code Ann., Lab. & Empl. § 3-413, Ms. Kambalame had an independent obligation to pay Ms. Lipenga $5.15 per hour at the beginning of the employment period, May 24, 2004, through February 15, 2006. § 3-413 (West 2004). Maryland raised its minimum wage by one dollar to $6.15 on February 16, 2006. § 3-413 (West 2006). Thus, from February 16, 2006 until the end of the employment period, January 20, 2007, Ms. Kambalame was obligated to pay Ms. Lipenga $6.15 per hour. However, as discussed *supra*, Ms. Kambalame paid Ms. Lipenga less than 50 cents per hour. ECF No. 1 ¶ 20.

Plaintiff has also stated a claim for failure to pay overtime under the MWHL. Under Md. Code Ann., Lab. & Empl. § 3-415, 3-420 (West 2004), Ms. Kambalame was obligated to pay Ms. Lipenga "at least 1.5 times the usual hourly wage" for "each hour over 40 hours that [the] employee works during 1 workweek." Ms. Lipenga worked an average of 108.5 hours per week, yet Ms. Kambalame paid her no salary for the first few months and far below the minimum wage

---

*sponte*, where there was no special circumstance warranting such action, such as a habeas petition or in forma pauperis complaint).

after that. ECF No. 1 ¶ 20; ECF No. 23-1 at 11. Ms. Lipenga alleges that she never received overtime compensation. Therefore, Plaintiff has stated a claim for both unpaid minimum wages and overtime under the MWHL.

### iv. False Imprisonment

To establish a claim of false imprisonment, a plaintiff must prove "1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Estate of Jones v. NMS Health Care of Hyattsville, LLC*, 903 F. Supp. 2d 323, 330–31 (D. Md. 2012) (quoting *Heron v. Strader*, 361 Md. 258, 264 (2000)). "To constitute a case of false imprisonment there must be some direct restraint of the person . . . Any exercise of force, or threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment." *Estate of Jones*, 903 F. Supp. 2d at 331 (quoting *Mason v. Wrightson,* 205 Md. 481, 487 (1954)) (alteration in original). Plaintiff fails to state a claim for false imprisonment because she has not alleged facts demonstrating "exercise of force or threat of force." *Cf. Lamb v. State*, 93 Md. App. 422, 426 (1992) (defining "force" as battery or "actual violence" and "threat of force" as assault or "putting in fear").

Ms. Lipenga alleges that Ms. Kambalame "refused to provide Ms. Lipenga with the security code to enter the house and refused to let Ms. Lipenga leave the house without permission." ECF No. 1 ¶ 46. However, merely instructing Ms. Lipenga that she was not to leave the house, or refusing to provide her with the code to re-enter the house, does not constitute use of force or threat of force. *Cf. Kelly v. West Cash & Carry Bldg. Materials Store*, 745 So. 2d 743, 750 (La. Ct. App. 1999) (noting that "submission to the mere directions of the employer, unaccompanied by force or threats, does not constitute false imprisonment."); *Trahan v.*

12

*Bellsouth Telecommunications, Inc.*, 881 F. Supp. 1080, 1084 (W.D. La. 1995) (finding no claim

for false imprisonment where employee-plaintiff was not physically restrained, nor was in fear of

physical restraint, but instead feared job loss if he left company premises). Confiscating Ms.

Lipenga's passport and threatening to have her deported, while indeed supporting some of Ms.

Lipenga's other claims, also does not constitute use of force or threat of force within the meaning

of false imprisonment. *See Baricuatro v. Industrial Personnel and Mgmt. Serv's, Inc.*, Civil

Action No. 11-2777, 2013 WL 3364348, at *3–4 (E.D. La. 2013) (holding plaintiffs did not state

a claim for false imprisonment where employer threatened them with deportation, because

financial or economic restraint was not sufficient to constitute false imprisonment). Ms. Lipenga

has alleged facts that she did not "feel comfortable leaving Ms. Kambalame's employ," but she

has not alleged facts that she was subject to force or threat of force. Thus, on the facts presented

Plaintiff has not stated a claim for false imprisonment.

### v. Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, a plaintiff must

demonstrate that "(1) the conduct is intentional or reckless; (2) the conduct is extreme and

outrageous; (3) there is a causal connection between the wrongful conduct and the emotional

distress; and (4) the emotional distress is severe." *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d

462, 481–82 (D. Md. 2002). To satisfy the first element, plaintiff must show that the defendant

either "desired to inflict severe emotional distress, knew that such distress was certain or

substantially certain to result from [her] conduct, or acted recklessly in deliberate disregard of a

high degree of probability that emotional distress would follow." *Brengle v. Greenbelt Homes,*

*Inc.*, 804 F. Supp. 2d 447, 452 (D. Md. 2011). To satisfy the second element, the conduct in

question must "go beyond all possible bounds of decency, and . . . be regarded as atrocious, and

utterly intolerable in a civilized community." *Kohler v. Shenasky*, 914 F. Supp. 1206, 1212 (D. Md. 1995) (quoting *Harris v. Jones,* 281 Md. 560, 611 (1977)) (alteration in original). "The extreme and outrageous character of the defendant's conduct may arise from [her] abuse of a position, or relation with another person, which gives [her] actual or apparent authority over [her]," and thus careful scrutiny is required "in cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress." *Figueiredo-Torres v. Nickel*, 321 Md. 643, 655 (1991) (discussing psychologist-patient relationship). "The fourth element requires the plaintiff to show that [she] suffered a *severely* disabling emotional response to the defendant's conduct," such that "no reasonable [person] could be expected to endure it" *Id.* (quoting *Harris v. Jones,* 281 Md. 560 (1977) (emphasis in original)).

Here, Ms. Kambalame's alleged acts in intentionally trafficking Ms. Lipenga to the United States, subjecting her to deplorable working conditions, and abusing her psychologically, all of which caused Ms. Lipenga severe physical and emotional distress, supports a claim for intentional infliction of emotional distress. Ms. Kambalame clearly abused her position of power over Ms. Lipenga to cause her severe emotional suffering. Plaintiff claims, among other allegations, that Ms. Kambalame forced Ms. Lipenga to work grueling hours, then sleep on a wooden floor in the basement with only one blanket. ECF No. 1 ¶ 29. Ms. Kambalame "vehemently scolded" Ms. Lipenga on a daily basis for no reason, and intentionally humiliated Ms. Lipenga in front of other members of the local Malawian community, by falsely accusing her of stealing and sleeping with Ms. Kambalame's boyfriend. ECF No. 1 ¶ 25. Ms. Kambalame also allegedly filmed Ms. Lipenga as she worked, waiting for her to make a mistake and then berating her to tears. *Id.* ¶ 26. Ms. Kambalame kept Ms. Lipenga in a perpetual state of fear and submission by threatening to have her deported. *Id.* ¶ 31. This abusive conduct caused Ms.

14

Lipenga mental, emotional, and physical anguish to the point that she could not eat, suffered a

rash over her whole body, and had to be hospitalized. *Id.* ¶ 27. As a result of these actions, Ms.

Lipenga was medically diagnosed with anxiety and depression. ECF No. 1 ¶ 50. In sum,

Plaintiff has stated a claim for intentional infliction of emotional distress.

### vi.  Intentional Misrepresentation (Common Law Fraud)

To state a claim for the tort of intentional misrepresentation, the plaintiff must show that:

> (1) the defendant made a false misrepresentation to the plaintiff;
>
> (2) that its falsity was either known to the defendant or the representation was made with reckless indifference as to its truth,
>
> (3) that the misrepresentation was made for the purpose of defrauding the plaintiff,
>
> (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and
>
> (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 444–45 (4th Cir.

2001). "Proof of promissory or predictive statements, made with the present intention not to

perform, satisf[ies] the first and second elements of this test." *Id.*

Here, Ms. Kambalame knowingly made a series of false statements to Ms. Lipenga in

order to induce her to sign documents and emigrate to the United States. Ms. Kambalame

assured Ms. Lipenga that she would enjoy working conditions and compensation consistent with

what she enjoyed in Malawi. ECF No. 1 ¶ 12. She told Ms. Lipenga that she would have the

opportunity to further her education and learn English. *Id.* However, on the facts presented, Ms.

Kambalame had no intention of honoring these statements. She subjected Ms. Lipenga to

debilitating working conditions and little pay. Ms. Lipenga was never allowed to go to school, in

fact, she was barely allowed to leave the house. Ms. Lipenga relied on Ms. Kambalame's misrepresentations to leave her family and home in Malawi and travel to the United States. As a result of this reliance, Ms. Lipenga suffered economic, physical, mental, and emotional injury. Hence, Plaintiff has stated a claim for intentional misrepresentation.

### vii.  Breach of Contract

To establish a claim for breach of contract, a plaintiff must demonstrate that a contract was formed, that the defendant breached the contract, and that the plaintiff suffered damages as a result. *Antonio v. Sec. Servs. of Am., LLC*, 701 F. Supp. 2d 749, 761 (D. Md. 2010) (citing *Parlette v. Parlette*, 596 A.2d 665 (Md. Ct. Spec. App. 1991)).

In this case, Ms. Kambalame and Ms. Lipenga formed a written contract, supported by consideration, and signed by both parties. ECF No. 1 ¶¶ 13–14; ECF No. 1-1. This contract stated, among other things, that Ms. Kambalame, as employer, would remunerate Ms. Lipenga, as employee, "a monthly salary of US$980 while in the USA." *Id.* The contract stated that Ms. Lipenga would work for "35 hours per week and will be entitled to receive overtime pay for US$6.71 each hour worked beyond the weekly agreed hours." *Id.* It further stated that Ms. Kambalame would be responsible for Ms. Lipenga's medical expenses, and that Ms. Lipenga would be entitled to paid sick leave and paid holidays for 2 weeks a year. *Id.* The contract also guaranteed that Ms. Lipenga's passport and immigration documents would not be withheld. *Id.* Plaintiff alleges that while she upheld her contractual duties and more, Ms. Kambalame failed to fulfill any of her obligations, including providing the agreed upon wage and benefits to Ms. Lipenga. ECF No. 1 ¶¶ 57–58; ECF No. 23-1 at 17–18. Hence, Ms. Kambalame breached the contract, and caused damage to Ms. Lipenga as a result. *Id.* Because Plaintiff has stated a claim for breach of contract, it is unnecessary to address her unjust enrichment claim. *See J.E. Dunn*

*Const. Co. v. S.R.P. Dev. Ltd. Partnership*, 115 F. Supp. 3d 593, 608 (D. Md. 2015) (citing *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96 (2000); *FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998)) (discussing that plaintiff cannot recover dually for breach of contract and unjust enrichment where express contract exists).

### B. Damages

Having established a claim on all grounds alleged, the Court must now make an independent determination of damages. *See Agora Fin., LLC*, 725 F. Supp. 2d at 494. Plaintiff seeks a total of $1,101,345.20 in damages, plus reasonable attorney's fees. ECF No. 23 at 1. Because the Court grants Plaintiff's damages under the TVPRA and MWHL in full, it is unnecessary to address damages under the remaining claims, which, as Plaintiff concedes, all stem from the same injury.

### i.  TVPRA Claim – Compensatory Damages

Plaintiff seeks compensatory damages under the TVPRA in the form of restitution and emotional distress. ECF No. 23-1 at 21–22. The Court is empowered to order restitution for offenses under the TVPRA. 18 U.S.C. § 1593(a). In remitting such restitution, the defendant shall pay the "full amount of the victim's losses," which includes "the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." § 1593(b). Where the employer has failed to keep time records, an employee satisfies her burden of proof with respect to hours worked where she "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 737 (D. Md. 2005) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). To that end, Plaintiff has submitted the Affidavit of Fainess B. Lipenga, ECF No. 23-2, and a spreadsheet summarizing Ms. Lipenga's hours worked and the

applicable minimum wage and overtime wages due beginning May 24, 2004 and ending January 19, 2007. ECF No. 23-3.

Plaintiff alleges that she worked an average of 108.5 hours per week and received a total of $4,360.00 over the course of approximately 139 weeks. The federal minimum wage was $5.15 per hour at all times relevant to this action. Based upon these calculations, Plaintiff's federal minimum wage deficiency was $73,268.53.[7] 29 U.S.C. § 216(b) further provides that employers found in violation of the FLSA shall be liable for unpaid wages and "an additional equal amount as liquidated damages." Hence, Plaintiff is entitled to $146,537.06 ($73,268.53 x 2) as restitution under the TVPRA.

In addition to lost wages, courts have also awarded compensatory damages for emotional distress under the TVPRA. *Lagasan*, 92 F. Supp. at 457–58 (E.D. Va. 2015); *Shukla*, 2012 WL 481796, at *14 (E.D.N.Y. Feb. 14, 2012); *Mazengo v. Mzengi*, No. 07-756, 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007); *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 24 (D.D.C. 2013); *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 594–95 (S.D.N.Y. 2012). "The forced labor addressed by the TVPA is a categorically different wrong . . . Limiting TVPA victims to the FLSA remedy would inappropriately afford criminals engaged in such egregious practices the benefit of the lowest-common-denominator minimum wage set for legitimate employers." *Francisco v. Susano*, 525 F. App'x 828, 835 (10th Cir. 2013). To calculate emotional distress damages, courts examine "the duration and intensity of the emotional distress" and consider "all relevant circumstances . . . including sex, age[,] condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm." *Mazengo v. Mzengi*, Case No. 07-cv-756, 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007)). Courts also "look to other awards in

---

[7] Plaintiff is also owed $31,471.08 in Maryland Wage and Hour Law Damages, discussed *infra*.

similar cases to ensure that the award is within a reasonable range." *Doe v. Howard*, Case No. 11-cv-1105, 2012 WL 3834867, at \*2 (E.D. Va. Sept. 4, 2012) (internal citations omitted).

Here, Ms. Lipenga "was essentially a prisoner for 971 days before she escaped." ECF No. 23-1 at 24. She was "a young female migrant, thousands of miles from home, often cut off from communicating with family in Malawi, her passport was confiscated, she spoke very little English, and she worked for a well-connected government official with diplomatic immunity." *Id.* As a result of Ms. Kambalame's abusive conduct, Ms. Lipenga suffered physical manifestations of her emotional distress, requiring hospitalization. In similar cases dealing with victims of human trafficking, courts have awarded plaintiffs between \$400 to \$780 per day. *See, e.g., Doe v. Howard,* No. 1:11–cv–1105, 2012 WL 3834867, at \*3–4 (E.D. Va. Sept. 4, 2012) (awarding \$500 per day for three months' forced labor); *Lagasan*, 92 F. Supp. 3d at 458 (\$400 per day for 18 months' forced labor); *Gurung v. Malhotra,* 851 F. Supp. 2d 583, 594 (S.D.N.Y. 2014) (awarding \$410 per day for 40 months' forced labor); *Shukla,* 2012 WL 481796, at \*15 (jury awarded \$780 per day for three and a half years' forced labor). Therefore, \$400 per day for 971 days, or \$388,400 in emotional distress damages is reasonable. Ms. Lipenga is thus entitled to a total of \$534,937.06 in compensatory damages (\$146,537.06 + \$388,400).

#### ii. TVPRA Claim – Punitive Damages

Plaintiff also seeks punitive damages under the TVPRA. "Punitive damages are generally appropriate under the TVPRA civil remedy provision because it creates a cause of action for tortious conduct that is ordinarily intentional and outrageous." *Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011) (describing human trafficking as a contemporary manifestation of slavery). "Punitive damages should be based on the degree of reprehensibility of the defendant's conduct" and "reflect the enormity of the offense." *Doe*, 2012 WL 3834867, at \*4–5 (quoting *BMV of N.*

*Am. v. Gore*, 517 U.S. 559, 575 (1996)). In TVPRA cases, courts have found that a 1:1 ratio of compensatory to punitive damages under the TVPRA is appropriate. *Lagasan*, 92 F. Supp. 3d at 458 (awarding $369,606 in compensatory damages and $369,606 in punitive damages); *Carazani*, 972 F. Supp. 2d at 26–27 (awarding $543,041.28 in compensatory damages and $543,041.28 in punitive damages, noting that "crime of forced labor and trafficking is particularly depraved.").

In the present case, Ms. Kambalame accepted Ms. Lipenga's labor and services around the clock, seven days a week, for over three years. Ms. Kambalame threatened Ms. Lipenga with deportation and separated her from other members of the local Malawian community. Ms. Kambalame psychologically abused Ms. Lipenga by filming her and tormenting her until she cried on tape. Ms. Kambalame forced Ms. Lipenga to sleep in the basement on the floor, even when Ms. Lipenga became severely ill. Ms. Kambalame refused to let Ms. Lipenga seek appropriate medical treatment, and effectively allowed Ms. Lipenga's HIV and tuberculosis to go untreated for the entire duration of her employment. Thus, punitive damages in the same amount as compensatory damages, or $534,937.06, is appropriate.

### iii. MWHL Claim – Restitution

Finally, Plaintiff requests $31,471.08, constituting an additional $5,257.50 in unpaid Maryland minimum wages and an additional $26,213.58 in unpaid Maryland overtime wages. Plaintiff claims that she is entitled to "the one-dollar-an-hour difference between the $5.15 per hour she recovers under federal law and the $6.15 per hour Ms. Kambalame owed her under Maryland's minimum wage." ECF No. 23-1 at 28. Maryland raised its minimum wage from $5.15 to $6.15 on February 16, 2006. *See* Md. Code Ann., Lab. & Empl. § 3-413 (West 2006). The Court agrees that Ms. Lipenga is entitled to $5,257.50, representing the 5,257.5 hours

worked after the state minimum wage increase. Additionally, Plaintiff requests $26,213.58, representing time-and-a-half owed for 68.5 hours each week from May 24, 2004 through February 15, 2006. Because Ms. Lipenga was entitled to an additional $2.58 for each overtime hour before Maryland's minimum wage increased on February 16, 2006, and $3.08 per hour after that date, Ms. Lipenga is entitled to a total of $26,213.58 in unpaid overtime. Accordingly, Plaintiff is entitled to a total of $31,471.08 under the Maryland Wage and Hour Law.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment, ECF No. 23, is granted, in part, and denied, in part.[8] Damages are awarded in the sum of $1,101,345.20 plus reasonable attorney's fees to be determined by separate motion and accompanying documentation. A separate Order follows.

Date: November 7, 2016

George J. Hazel
United States District Judge

---

[8] For the reasons stated above, Plaintiff's claim for false imprisonment is dismissed.